<table>
<tr><td>District Court, Jefferson County, Colorado<br>100 Jefferson County Pkwy.<br>Golden, CO 80401</td><td rowspan="2">DATE FILED<br>April 30, 2026 8:39 PM<br>FILING ID: 91C4D7093FF74<br>CASE NUMBER: 2026CV30756</td></tr>
<tr><td><b>THE ESTATE OF JASMINE CASTRO</b>,<br>Plaintiff<br><br>v.<br><br><b>MARC FAIVRE</b>,<br><b>TIM FUSS</b>,<br><b>SCOTT SCHILB</b>,<br><b>CITY OF THORNTON, COLORADO</b>;<br>Defendants</td></tr>
<tr><td></td><td>▲ Court Use Only ▲</td></tr>
<tr><td><i>Attorney for Plaintiffs Estate of Jasmine Castro</i><br>Jason Kosloski, #50214<br>Kosloski Law, PLLC<br>1401 Lawrence Street, Suite 1600<br>Denver, CO 80202<br>(720) 605-6487<br>jkosloski@koskoskilaw.com</td><td>Case No.:<br><br>Division:</td></tr>
<tr><td colspan="2"><b>COMPLAINT AND JURY DEMAND</b></td></tr>
</table>

Plaintiff, The Estate of Jasmine Castro, by and through its attorney, Jason Kosloski of

KOSLOSKI LAW, PLLC, submits the following Complaint and Jury Demand against Defendants Marc

Faivre, Tim Fuss, Scott Schilb, and the City of Thornton, Colorado:

### INTRODUCTION

1) On April 29, 2024, Jasmine Castro was a 30-year-old young woman with the rest of her life ahead of her. On April 30, 2024, Jasmine Castro lay dead, shot in the back of her head by Defendants Faivre, Fuss, and Schilb because of these Defendants' unreasonable and excessive force that was the foreseeable result of Defendant Thornton's unconstitutional policies, lack of oversight and supervision of its Impact Team, and unreasonable and deficient training.

2) After the shooting, the First Judicial District Attorney's Office investigated the Defendants' actions. Although declining to bring criminal charges, the District Attorney's report sharply criticized the Defendants' actions, finding that Defendants Fuss and Faivre's actions were unreasonable, calling Defendant Faivre's actions, specifically, "problematic," and finding that Defendant Thornton's use-of-force policy to be "problematic" and inconsistent with inconsistent with Colorado law.

1

<b>Exhibit A</b>

3) Because of Defendants Faivre, Fuss, and Schilb's actions on April 30, 2024, Jasmine Castro lost her life, and Nancy Castro lost her daughter. The Estate and Ms. Castro bring this action to seek some measure of justice for this loss of life and to hold Defendants accountable for their unconstitutional actions, policies, lack of supervision, and training.

## JURISDICTION

4) This lawsuit arises under both the Colorado and United States Constitutions, and the laws of the State of Colorado, and is brought under C.R.S. 13-21-131 and 42 U.S.C. 1983. This Court has subject matter jurisdiction over this case.

5) The tortious acts alleged in this lawsuit occurred within the State of Colorado. Defendant Thornton transacts business within the State of Colorado and owns or possesses real property within the State of Colorado. Therefore, this Court has personal jurisdiction over the Defendants pursuant to C.R.S. 13-1-124.

6) Venue is proper pursuant to C.R.C.P. 98(c) because Jasmine Castro was shot and killed in Jefferson County.

## PARTIES

7) At all times relevant, decedent, Jasmine Castro, was a resident of and domiciled within the State of Colorado.

8) The Estate of Jasmine Castro was opened in Jefferson County on March 27, 2026. Nancy Castro is the personal representative of the Estate of Jasmine Castro. Nancy Castro is Jasmine Castro's mother.

9) Upon information and belief, at all times relevant, Defendant Marc Faivre was a resident of and domiciled within the State of Colorado. At all times relevant, Defendant Faivre was a peace officer as defined in C.R.S. 24-31-901(3). At all times relevant, Defendant Faivre was employed by Defendant City of Thornton as a police officer. At all times relevant, Defendant Faivre was acting under color of state law and in his capacity as a police officer employed by the City of Thornton.

10) Upon information and belief, at all times relevant, Defendant Tim Fuss was a resident of and domiciled within the State of Colorado. At all times relevant, Defendant Fuss was a peace officer as defined in C.R.S. 24-31-901(3). At all times relevant, Defendant Fuss was employed by Defendant City of Thornton as a police officer. At all times relevant, Defendant Fuss was acting under color of state law and in his capacity as a police officer employed by the City of Thornton.

11) Upon information and belief, at all times relevant, Defendant Scott Schilb was a resident of and domiciled within the State of Colorado. At all times relevant, Defendant Schilb was a peace officer as defined in C.R.S. 24-31-901(3). At all times relevant, Defendant Schilb was employed by Defendant City of Thornton as a police officer. At all times relevant, Defendant Schilb was acting under color of state law.

12) Defendant City of Thornton is a home rule municipality organized under the laws and constitution of the State of Colorado.

13) The Thornton Police Department is a law enforcement agency that is a part of the City of Thornton, and which employed Defendants Faivre, Fuss, and Schilb.

14) At all times relevant, Defendant City of Thornton, through the Thornton Police Department, was responsible for the oversight, supervision, discipline, and training of Thornton Police Department personnel, including Defendants Faivre, Fuss, and Schilb.

### FACTUAL ALLEGATIONS

15) On April 30, 2024, Jasmine Castro was 30 years old. She was the daughter of Nancy Castro. Jasmine was loved by her community and had a full life ahead of her.

16) On April 30, 2024, Defendants Faivre, Fuss, and Schilb were police officers, employed by Defendant Thornton, and assigned to the Thornton Police Department's Impact Team.

17) The Impact Team was a specialized "proactive" unit within the Patrol Division of the Thornton Police Department.

18) On April 30, 2024, Defendants Faivre, Fuss, and Schilb were on duty and working in their capacity of police officers with the Impact Team.

19) Defendants Faivre, Fuss, and Schilb were driving unmarked police vehicles and did not wear police uniforms.

20) Defendant Faivre and Schilb occupied an unmarked truck. Defendant Faivre was driving, and Defendant Schilb was the front-seat passenger. There were no other passengers in this unmarked truck. This truck looked nothing like a typical police vehicle, and indeed, upon information and belief, was designed to not appear like a police vehicle.

21) Defendant Fuss was driving an unmarked SUV. There were no passengers in this unmarked SUV. Upon information and belief, this SUV was designed and selected to not appear like a police vehicle.

22) At approximately 2:37AM on April 30, 2024, Defendants Faivre and Schilb saw an Infiniti vehicle pass them in the 8400 Block of Washington Street, in Adams County, Colorado.

23) Jasmine Castro was one of two occupants of this Infiniti. The other occupant was a young man named Joby Vigil.

24) Defendant Schilb looked through binoculars and saw that the Infiniti did not have a rear license plate.

25) Because of this missing license plate, Defendants Faivre, Schilb, and Fuss began following the Infiniti.

3

26) After following behind the Infiniti for some time, the Infiniti pulled into the Twin Lakes Park parking lot, at approximately 70th Avenue and Broadway Street, and Adams County.

27) Defendants Faivre and Schilb, still driving an unmarked truck with nothing to identify it as an actual police vehicle, pulled behind the Infiniti.

28) Defendant Faivre saw that the driver of the Infiniti was a man – Joby Vigil.

29) The Infiniti made a U-turn in the parking lot and started driving away.

30) The Infiniti drove to I-25 and began driving south on the highway.

31) The Infiniti left the boundaries of the City of Thornton.

32) Defendants Faivre, Schilb, and Fuss followed the Infiniti, despite knowing that it had left their jurisdiction.

33) Defendants Faivre, Schilb, and Fuss did not inform any of the jurisdictions that they were driving through that they were following an Infiniti without a license plate.

34) Defendants Faivre, Schilb, and Fuss did not ask for any assistance from police officers who would be identifiable as police officers.

35) The Infiniti exited I-25 on 8th Avenue, drove west to Federal Boulevard, drove south to Alameda Avenue, and turned west on Alameda Avenue.

36) The Infiniti drove at or near the speed limit. Aside from not having a license plate, the Infiniti committed no traffic violations nor engaged in any dangerous driving.

37) Defendants Faivre, Schilb, and Fuss followed the Infiniti the whole way.

38) No other law enforcement officers joined or attempted to pull the Infiniti over, despite the Infiniti driving into multiple different cities and policing jurisdictions.

39) It is common knowledge that people sometimes impersonate police officers by displaying red and blue lights on vehicles that are not police vehicles.

40) From the perspective of a reasonable person in the Infiniti, all they would know is that they are being chased all over metro Denver in the middle of the night by people in cars that do not look like police cars without any identifiable police officers intervening.

41) From the perspective of a reasonable person in the Infiniti, this would be a deeply scary and unsettling experience.

42) Eventually, the Infiniti pulled into the parking lot of Shell Gas Station on the northwest corner of 5205 West Alameda Avenue, in the City of Lakewood, which is in Jefferson County. The Infiniti then drove into a parking lot behind the gas station and stopped.

43) Instead of asking for assistance from the Lakewood Police Department, Defendants Faivre, Schilb, and Fuss followed the Infiniti into the parking lot.

44) Upon information and belief, Defendants Faivre, Schilb, and Fuss did not turn on their emergency lights while approaching the Infiniti.

45) The male driver of the Infiniti got out of the Infiniti and walked to the back of the Infiniti.

46) As Defendants Faivre, Schilb, and Fuss were driving towards the Infiniti, Defendant Fuss claimed that the driver of the Infiniti fired two gunshots while Defendants Faivre, Schilb, and Fuss were still about 50-100 yards away. Defendants Faivre and Schilb claimed that they heard the gunshots.

47) Neither Defendants Faivre or Schilb saw who fired the gunshots but heard them and heard Defendant Fuss state that the driver "just shot at me."

48) The driver of the Infiniti (Joby Vigil) then got back in the Infiniti and began driving away.

49) Defendants Faivre, Schilb, and Fuss began chasing the Infiniti, this time with their emergency lights turned on.

50) The Infiniti sped well above the speed limit west on Alameda Avenue before turning north on Garrison Street.

51) As the Infiniti drove down Garrison Street, Defendant Faivre intentionally crashed his truck into the Infiniti. The Infiniti careened into a ditch.

52) Both Joby Vigil and Jasmine Castro started climbing out of the driver-side window of the Infiniti.

53) Defendant Faivre (the driver of the truck) was able to see both Mr. Vigil and Jasmine Castro in the Infiniti.

54) Defendant Faivre was about 10 feet away from the Infiniti.

55) Defendant Faivre did not see any weapons in Jasmine Castro's possession.

56) Defendant Faivre pulled out his handgun and pointed it at Jasmine Castro.

57) Defendant Faivre did not give any commands or orders to Jasmine Castro.

58) Instead, Defendant Faivre immediately began shooting Jasmine Castro as she was climbing headfirst out of the window away from him.

59) While this was happening, Defendant Schilb and Fuss were getting out of their respective seats (Schilb, the front-seat passenger in the truck, and Fuss, the driver of the SUV).

60) Defendant Fuss was armed with a handgun and Defendant Schilb was armed with a high-powered assault rifle.

61) Defendant Fuss ran around the back of the Infiniti and saw Jasmine Castro climbing out of the window.

62) Defendant Fuss believed that he saw a black object in Jasmine Castro's hand.

63) Defendant Fuss did not tell any other Defendant that he saw a black object in Jasmine Castro's hand.

64) Jasmine Castro came out of the Infiniti's window and fell on her hands and knees. Jasmine Castro began turning away from Defendant Fuss.

65) Defendant Fuss began shooting at Jasmine Castro as she turned away from him.

66) Defendant Schilb ran from the passenger seat of the truck and behind the Infiniti.

67) Defendant Schilb saw Jasmine Castro laying on the ground.

68) Defendant Schilb raised his rifle, pointed it at Jasmine Castro, and shot Ms. Castro multiple times with his rifle while she lay on the ground.

69) Both Jasmine Castro and Joby Vigil were killed by Defendants' Faivre, Schilb, and Fuss's gunfire.

70) Specifically, Jasmine Castro was shot at least thirteen times, mostly in the back, including the back of her head:

   a) Gunshot wound of the lower leg. Front to back, upward, and slightly left to right.

   b) Gunshot wound of left wrist. Front to back, slightly down, and with no discernible left/right deviation.

   c) Graze wound of right forearm. Front to back, slightly down, and with no discernible left/right deviation.

   d) Graze wound of anterior right axilla. Front to back, slightly downward, and slightly left to right.

   e) Gunshot wound of right buttock. Back to front, down, and slightly left to right.

   f) Gunshot wound of right jaw. Front to back, up, and slightly right to left.

   g) Gunshot wound of head. Back to front, left to right, and roughly horizontal.

   h) Gunshot wound of right chest. Right to left, up, and with no discernible front/back deviation.

   i) Gunshot wound of right chest. Front to back, up, and slightly right to left.

   j) Gunshot wound of left abdomen.

k) Gunshot wound of right lateral back. Right to left, up, and with an undetermined degree of front/back deviation.

l) Gunshot wound of left lateral back. Left to right, up, and with undetermined front/back deviation.

m) Gunshot entrance wound to posterior left shoulder. Left to right, and with undermined up/down and back/front deviation.

71) Jasmine Castro died, lying face down on the ground, while Defendants Faivre, Schilb, and Fuss pumped her body full of bullets.

72) After autopsy, Forensic Pathologist Dr. John Carver determined that Jasmine Vigil dead from multiple gunshot wounds and that the manner of death was homicide.

73) The First Judicial District Attorney's Office investigated this killing.

74) As part of its investigation, the First Judicial District Attorney's Office hired Seth Stoughton, a nationally recognized expert in policing, to evaluate the actions of the Defendants.

75) Dr. Stoughton concluded that both Defendant Faivre and Defendant Fuss's use of deadly force against Jasmine Castro was inconsistent with generally accepted police practices.

76) Alexis King, the First Judicial District Attorney, released her report and conclusions on April 9, 2025.

77) Although declining to file charges, Ms. King, concluded that Defendant Faivre's actions were "problematic" and unreasonable.

78) Moreover, Ms. King concluded that the Thornton Police Department's use-of-force policy that was in effect on April 30, 2024, (Policy 300) was "problematic" and "runs contrary" to Colorado law.

79) Indeed, less than four months after the First Judicial District Attorney's report, the Thornton Police Department modified its use-of-force policy, changing the portions of the policy that Ms. King identified as problematic and contrary to the law.

80) Upon information and belief, the unconstitutional use of force (and other constitutional violations) was a well-known problem with members of Thornton's Impact Team.

81) The killing of Jasmine Castro and Joby Vigil on April 30, 2024, was at least the third time in less than a year that the Impact Team shot people out of their jurisdiction and justified it by claiming that the victim shot at them.

a) On May 31, 2023, the Impact Team followed a Scion over 8 miles out of Thornton, into Denver, before shooting the driver, Jedidiah Wilson, in what one responding Denver Police Officer described as "a nightmare."

b) On October 11, 2023, the Impact Team followed a car for 39.7 miles, into Castle Rock. During the drive, the Impact Team claimed that the occupants of the car shot at them. When the car was stopped, Kyle Williamson was shot at over 30 times, and hit six times.

82) Upon information and belief, it was common for the Impact Team to follow cars out of Thornton, in violation of Thornton's own policies.

83) The Thornton Police Department conducted an internal investigation into Defendants Faivre, Schilb, and Fuss's actions on April 30, 2024.

84) According to Defendant Fuss himself in his internal affairs interview, "Officer Fuss knew that the directions given to him by his supervisors violated policy but did not question the orders, just went along with them and thus violated policy. Officer Fuss stated that Command wanted results and was aware that the IMPACT team was violating policy, but he did not question the direction they were told to take."

85) The Thornton Police Department concluded that the Defendants actions on April 30, 2024, violated policy.

86) In line with their decision to allow the Impact team to violate policy and to pursue "results" over all else, the Thornton Police Department decided to not impose any discipline.

87) Shortly after Jasmine Castro's death, the Thornton Police Department completely dissolved the Impact Team.

88) Jasmine Castro and Joby Vigil were the second and third people that Defendant Fuss killed in April, 2024. Just two weeks prior, Defendant Fuss shot and killed Joseph Martinez on April 14, 2024. The Thornton Police Department apparently returned Defendant Fuss to a highly aggressive team with a penchant for breaking the the rules and shooting at people two weeks after he killed someone. Upon information and belief, this is not reasonable within the field of policing. Upon information and belief, this failure to properly supervise and culture of violence directly contributed to Jasmine Castro's death.

89) Because the Defendants killed Jasmine Castro, Nancy Castro has lost her young daughter. She will never again be able to spend time with her daughter. She will never hear her laugh again. Her death has left a permanent void in the lives of her family and community.

### STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Unreasonable Seizure and Excessive Force – Violation of C.R.S. 13-21-131 and Article II, Section 7 of the Colorado Constitution
(Against Defendants Faivre, Schilb, and Fuss)**

90) Plaintiff hereby incorporates all other paragraphs in this Complaint as if fully set forth herein.

91) Defendants Faivre, Schilb, and Fuss are, and were at all relevant times, peace officers as defined by C.R.S. 24-31-901(3) and therefore subject to C.R.S. 13-21-131.

92) Jasmine Castro had an individual right to be free from unreasonable seizures guaranteed by Article II, Section 7 of the Colorado Constitution. This includes the right to be free from excessive force.

93) On April 30, 2024, Defendants Faivre, Schilb, and Fuss seized Jasmine Castro.

94) This seizure was an arrest.

95) Defendants Faivre, Schilb, and Fuss did not have probable cause to arrest Jasmine Castro.

96) No warrant existed commanding the arrest of Jasmine Castro.

97) Defendants Faivre, Schilb, and Fuss used objectively unreasonable and excessive force in seizing Jasmine Castro.

98) Defendants Faivre, Schilb, and Fuss recklessly created the situation in which they used force.

99) Jasmine Castro died as a direct and proximately caused consequence of Defendants Faivre, Schilb, and Fuss's unreasonable and unconstitutional seizure.

100) Defendants Faivre, Schilb, and Fuss's actions subjected Jasmine Castro, or caused Jasmine Castro to be subjected, to the deprivation of her individual rights to be free from reasonable seizures and to not be subjected to excessive force, that are guaranteed by Article II, Section 7 of the Colorado Constitution.

101) Defendants Faivre, Schilb, and Fuss also violated C.R.S. 18-1-707 by, at minimum, failing to apply nonviolent means before resorting to physical force and by using physical force when it was not necessary, and by using deadly force without giving a clear verbal warning of his intent to use firearms or other deadly force, with sufficient time for the warning to be observed.

102) Defendants Faivre, Schilb, and Fuss are not entitled to any sort of immunity, including qualified immunity or "common law immunity" as a defense to liability pursuant to C.R.S. 13-21-131(2)(b).

103) Defendants Faivre, Schilb, and Fuss are not entitled to any sort of statutory immunity or statutory limitation on liability, damages, or attorney's fees pursuant to C.R.S. 13-21-131(2)(a).

104) Defendant City of Thornton is required to indemnify Defendants Faivre, Schilb, and Fuss for any liability incurred through any judgment or settlement under this claim.

105) Defendants Faivre, Schilb, and Fuss's conduct, as described herein, was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, and/or they acted heedlessly and recklessly without regard to Jasmine Castro's constitutionally protected rights.

106) As a direct and proximate result of Defendants Faivre, Schilb, and Fuss's actions, Plaintiff Estate of Jasmine Castro suffered actual injuries, damages, and losses in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**Unreasonable Seizure and Excessive Force – Violation of 42 U.S.C. 1983 and the Fourth Amendment to the United States Constitution**
**(Against Defendants Faivre, Schilb, and Fuss)**

107)   Plaintiff hereby incorporates all other paragraphs in this Complaint as if fully set forth herein.

108)   Defendants Faivre, Schilb, and Fuss acted under color of state law, and within the course and scope of their employment and in their capacities as police officers for the Thornton Police Department, at all times relevant to this complaint.

109)   Defendants Faivre, Schilb, and Fuss are "persons" under 42 U.S.C. 1983.

110)   Jasmine Castro had a clearly established right protected by the Fourth Amendment to the United States Constitution to be free from unreasonable seizures. This includes the clearly established right to be free from excessive force at the hands of police officers.

111)   On April 30, 2024, Defendants Faivre, Schilb, and Fuss seized Jasmine Castro, including by shooting her.

112)   This seizure was done by the use of deadly force.

113)   Defendants Faivre, Schilb, and Fuss used objectively unreasonable and excessive force in seizing Jasmine Castro by shooting her.

114)   Defendants Faivre, Schilb, and Fuss recklessly created the situation in which they used force.

115)   Jasmine Castro died as a direct and proximately caused consequence of Defendants Faivre, Schilb, and Fuss's unreasonable and unconstitutional seizure.

116)   Any reasonable police officer in Defendants Faivre, Schilb, and Fuss's position would have known that Jasmine Castro had a clearly established right to be free from unreasonable seizures and excessive force.

117)   As a direct and proximate result of Defendants Faivre, Schilb, and Fuss's actions, Plaintiff Estate of Jasmine Castro, has suffered damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. 1983 – Monell Liability**
**(Against Defendant City of Thornton)**

118)   Plaintiff hereby incorporates all other paragraphs in this Complaint as if fully set forth herein.

119)   The Thornton Police Department is a department of Defendant City of Thornton. All actions of the Thornton Police Department are actions of Defendant City of Thornton.

120) The federal constitutional violations described herein were caused by the policies, customs, and practices of Defendant City of Thornton acting through its police department, including but not limited to:

a) A deficient use-of-force policy permitting its police officers to use force when that force would be unconstitutional and/or in violation of Colorado state law. Plaintiff expressly alleges that this policy was unconstitutional and permitted Defendants Faivre, Fuss, and Schilb to engage in unreasonable and excessive force in this situation.

b) A policy or custom of permitting and encouraging its police officers, including specifically its Impact Team to use excessive and unconstitutional force.

c) A policy or custom permitting and encouraging its police officers, including specifically its Impact Team to violate policies of the Thornton Police Department and/or state law.

d) A policy or custom of failing to adequately investigate the use of force by its police officers, including Defendant Fuss and the Impact Team.

e) A policy or custom of allowing officers who kill people to remain in or quickly return to roles where they are likely to confront volatile situations.

f) A failure to properly supervise the Impact Team and/or deliberately permit the Impact Team to violate constitutional rights, Thornton Police Department policy, and Colorado state law.

g) A failure to discipline Defendants Faivre, Fuss, and Schilb for their unconstitutional actions in this case, implicitly endorsing it.

121) These customs and practices, along with others that Plaintiff alleges they will likely discover during the course of this case, were the moving force behind the constitutional violations described in this Complaint.

122) Defendant City of Thornton had actual or constructive notice of the risk that their policies, customs, and practices would lead to constitutional violations, yet they acted with deliberate indifference to that risk.

123) As a direct and proximate result of the policies, customs, and practices of Defendant City of Thornton, acting through its police department, Plaintiff Estate of Jasmine Castro, has suffered damages in an amount to be determined at trial.

### CONCLUSION AND PRAYER FOR RELIEF

124) Therefore, Plaintiff Estate of Jasmine Castro respectfully requests that the Court enter judgment in its favor and against Defendants, and award it all relief allowed by law, including but not limited to the following

a) All appropriate relief at law and equity.

b) Declaratory relief and other appropriate equitable relief.

c) Economic losses on all claims allowed by law.

d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial.

e) Attorney's fees and the costs associated with this action, including expert witness fees, on all claims allowed by law.

f) Pre- and post-judgment interest at the appropriate lawful rate; and

g) Any further relief that this Court deems just and proper, and any other relief as allowed by law.[1]

## JURY DEMAND

125) Plaintiff demands a jury trial on all issues so triable.


Dated April 30, 2026.


KOSLOSKI LAW, PLLC


By: /s/ Jason Kosloski
Jason Kosloski, #50214
Attorney for Plaintiff Estate of Jasmine Castro

---

[1] Plaintiff gives notice of its intent to move to amend this Complaint to add punitive damages following the completion of discovery or before.